NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                    :
WILLIAM CARROLL,                    :
                                    :
            Plaintiff,              :      Civil No. 06-4869 (RBK)
                                    :
      v.                            :      **OPINION**
                                    :
MICHAEL J. ASTRUE, COMMISSIONER     :
OF SOCIAL SECURITY,                 :
                                    :
            Defendant.              :
_____:

**KUGLER**, United States District Judge:

      This matter comes before the Court upon appeal by Plaintiff William Carroll ("Carroll" or "Claimant"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income[1]. For the reasons set forth below, the Court remands this case for further proceedings.

**I.    BACKGROUND**

      Carroll, a forty-three year old high school graduate, alleges that he is disabled with an onset date of October 30, 2001 because of severe mental impairments resulting from bipolar disorder, major depression, dysthemic disorder, and alcohol dependence and abuse. (R. at 13.)

---

[1] Michael Astrue is substituted for Linda McMahon as Commissioner of the Social Security Administration pursuant to Federal Rule of Civil Procedure 25(d)(1).

Carroll has a high school education, and he has some vocational training in computer technology. (R. at 302.) He has performed past work as a security officer and dispatcher, a home improvement contractor, a computer systems analyst, a building maintenance technician, and a library technician. (R. at 90.) Currently he does not work and has not since 2001, when he left his last job because of a conflict with a supervisor. (R. at 149, 305.)

Carroll has been treated for mental disorders and substance abuse by several different physicians in both inpatient and outpatient settings. On February 16, 1998, he was admitted to Hampton Hospital after having attempted suicide, and he was diagnosed with major depression and alcohol dependence. Doctors evaluated his Global Assessment of Functioning score, which is a rating on a scale from 0 to 100 of overall psychological functioning. On his admission to Hampton, Carroll had a GAF of 20. (R. at 112-13.) He was prescribed several medications, and dismissed with an improved GAF of 76 to outpatient therapy on February 26, 1996. (R. at 113-14.)

Carroll was admitted to St. Francis Medical Center on January 28, 1998 after complaining of suicidal thoughts and depression, and he was discharged on February 3, 1998 with prescribed medications. (R. at 115.) He was voluntarily readmitted to St. Francis Medical Center on February 8, 2002, for depression, alcohol dependence and substance abuse, and possible bipolar and mood disorder. (R. at 148.) He was discharged on February 11, 2002. (R. at 148.)

Carroll was subsequently admitted to the Hampton Behavioral Heath Center in April, 2002 with suicidal ideation and increased depression. He remained there for six days. (R. at 168-70.) After this hospitalization, he began treatment with Dr. Margaret Willman, a psychiatrist at the Lester A. Drenk Behavioral Health Center. Until January 2003, she saw him

2

every two weeks for therapy. (R. at 172.) She observed that at his first visit, he had mood swings, paranoia, and impaired judgment but was oriented as to time, place, and person; was cooperative; and had logical thought processes. She noted that "patient cannot function" and was "unable to hold a job." (R. at 174.) She noted that he had "problematic" memory and fair concentration, persistence, and pace. He also had poor social interaction, and poor ability to reason, use judgment, and make occupational, personal and social adjustments. (R. at 175.) Dr. Willman noted that Carroll's mother took care of his daily needs, but that he could take public transportation and manage his own money, and had friends online. (R. at 175.) Later on in the course of Carroll's treatment, she stated that he was initially non-compliant but has been able to get Medicaid and appeared to be more invested in treatment. (R. at 176.) Dr. Willman listed Carroll's prognosis as "guarded." (R. at 176.)

At his discharge from the Drenk Center on January 14, 2003, Carroll's treatment summary explained that he did not feel comfortable in the recovery group, dropped out of individual treatment because of transportation problems, and "would not problem solve with counselor." He "stopped taking his medication in his last month [there]," made suicidal and violent threats to his mother which led to a police visit, and began drinking again. (R. at 183.) On Carroll's discharge form, his GAF score is listed as 45, the same as it was upon his admission. (R. at 184.) Carroll's discharge from the Drenk Center referred him to the Family Services program, where he began treatment. (R. at 275.) He was scheduled to attend treatment programs three times per week. (R. at 275.)

Dr. Donald Moorehead performed a psychiatric evaluation of Carroll on November 3, 2003. (R. at 203.) He diagnosed Carroll with bipolar disorder, alcohol and other substance dependence and abuse, and personality disorder as well as hypertension and some trauma, and

described his prognosis as "guarded." (R. at 207.) Dr. Moorehead stated that Carroll's ability to perform activities of daily living was mildly restricted, and his ability to function socially and to maintain concentration, persistence, and pace at work were moderately limited. (R. at 218.)

Later that same month, Dr. M. Apacible evaluated Carroll. (R. at 222-24.) This assessment found that Carroll's abilities to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual were moderately limited, as were his abilities to complete a normal work day and work week and to perform work at a consistent pace. (R. at 222-23.) Dr. Apacible concluded that Carroll has a "mildly impaired memory" and poor family relationships with history of abuse. "Otherwise exam findings are benign and objective clinical evidence supports the capability to perform [substantial gainful activity] in simple tasks." (R. at 224.)

Carroll continued to receive treatment at the Family Services program regularly beginning in January 2003 and saw Dr. Berwish every one or two months beginning in May 2004. (R. at 21, 268, 274.) The last report from Dr. Berwish in the record is from August 24, 2005; Carroll was diagnosed with bipolar disorder and alcohol dependence in early remission, with a GAF of 60-65. (R. at 226.) Dr. Berwish noted that Carroll has "reasonable stability if compliant" with his medication, but "despite medication compliance he can be destabilized by situational stressors." (R. at 270.) He listed examples of stressors which include housing, finances, social contacts, and substance abuse. (R. at 270.) Dr. Berwish stated that he could not predict how often Carroll would miss work due to his impairment, but that "when depressed, [he] has a history of inability to get out of bed or bathe, much less go to work." (R. at 271.) He also indicated that Carroll's substance abuse was not the primarily reason for his symptoms and the mania/hypomania continues even when Carroll abstains from alcohol. (R. at 272.)

Dr. Berwish identified symptoms of mood disturbance, uncontrollable emotions, social isolation, and intermittent oddities of thought, perception, speech, or behavior (while not on medication).  Other symptoms he noted Carroll experienced "when depressed" include  poor memory, appetite disturbance, sleep disturbance, difficulty concentrating or thinking, and decreased energy.  (R. at 268-69.)

Carroll applied for disability insurance benefits and supplemental security income on October 21, 2002, alleging that his disability began October 30, 2001.  The applications were denied, and Carroll requested a hearing.  This hearing was held on September 15, 2005 before ALJ Christopher Bullard ("ALJ Bullard").  At the hearing, Carroll testified, as well as Vocational Expert Mitchell Schmidt.  Mr. Schmidt, in response to a hypothetical question posed by the ALJ, opined that an individual with non-exertional limitations who could only occasionally relate to co-workers, the public, and supervisors, would be able to perform Carroll's past relevant work as a commercial cleaner.  (R. at 320.)  Carroll's attorney posed a different hypothetical to the vocational expert, asking if the individual in question could perform any of the past relevant work if he was markedly limited in his ability to accept instructions and to respond to criticism from supervisors.  Mr. Schmidt responded that "a marked limitation would. . . preclude performing even unskilled work."  (R. at 325.)  ALJ Bullard issued his decision denying Carroll's claims on October 7, 2005.  Carroll timely appealed from this decision, and this Court has jurisdiction pursuant to 42 U.S.C. § 405(g)

## II.    STANDARD OF REVIEW

District Court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla.

5

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A district court may not weigh the evidence or substitute its conclusions for those of the fact-finder.").

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)) ("[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Secretary of Health and

Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d 110, 114 (3d Cir. 1983)).

**III.   DISCUSSION**

For disability insurance benefits, a claimant must meet the insured requirements of the Social Security Act.  To receive these benefits, a claimant must prove disability on or before the date the insured requirements were last met.  These requirements do not apply to claims for supplemental security income.

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and to analyze whether the RFC would entitle the claimant to return to her "past relevant work."  20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20

C.F.R. § 404.1520(f)).

Preliminarily, ALJ Bullard determined that Carroll met the insured status requirements through December 31, 2005 and was eligible to apply for disability insurance benefits in addition to supplemental security income. (R. at 13.) The ALJ next applied the five-step process to evaluate whether Carroll was disabled. He first determined that Carroll had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 14.) He next concluded that Carroll's bippolar disorder, substance abuse disorder, and personality disorders constituted severe impairments, and he also concluded that Carroll's alleged physical impairments of hypertension and knee damage were not severe impairments. (R. at 15.) Moving to step three, ALJ Bullard concluded that while Carroll's impairments from his bipolar disorder, substance abuse disorder, and personality disorder were severe, they did not meet the requirements of the listings of impairments, specifically referencing Listing 12.04 (Affective Disorders), Listing 12.08 (Personality Disorders), and Listing 12.09 (Substance Abuse Disorders). (R. at 15.) The ALJ next concluded that Carroll retained the residual functional capacity to perform work activities at all exertional levels but with significant non-exertional limitations interfering with his work ability. (R. at 18.) He noted that the evidence supported a finding that Carroll is "restricted to work which requires simple tasks, simple instructions, and only occasionally relating to co-workers, the general public, and supervisors." (R. at 18.) Finally, relying on this RFC determination and the testimony of Vocational Expert Schmidt, the ALJ concluded that Carroll could return to his past relevant work as a commercial cleaner. (R. at 26.)

Carroll argues that the ALJ's decision is not supported by substantial evidence. First, he contends that ALJ Bullard erred by not giving proper weight to the opinions of Carroll's treating physicians and improperly substituting his own medical opinions. Carroll also argues that the

ALJ erred in evaluating Carroll's credibility. Finally, Carroll assigns error to ALJ Bullard's evaluation of the vocational evidence, particularly the testimony of the vocational expert in response to a hypothetical question based on the opinions of Carroll's treating physicians.

In evaluating a claim for disability, the ALJ is to weigh the medical evidence together with all other relevant evidence. 20 C.F.R. § 404.1527(b). All medical opinions are to be considered; however, different weight is accorded to them depending on the nature and duration of the physician-patient relationship, how much evidence is presented in support of the opinion, the consistency of the opinion with the record as a whole, and the physician's level of expertise. 20 C.F.R. § 404.1527(d). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). An ALJ may choose to give greater or lesser weight to conflicting medical evidence but may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not based on his own credibility judgments, speculation or lay opinion. Id. at 317.

### Hampton Behavioral Health Center

In his decision, ALJ Bullard discussed Carroll's hospitalization at Hampton Behavioral Heath Center in April, 2002. (R. at 19.) Carroll was admitted with suicidal ideation and increased depression. His reason for his voluntary admission was "I was to kill myself." (R. at 168.) He apparently had "a plan to overdose or walk in front of a car." (R. at 169.) The doctors at the Hampton Behavioral Health Center evaluated Carroll's GAF score. His discharge summary indicates that his GAF on admission was 20 and on discharge six days later was 45.

(R. at 169-70). Regarding Carroll's GAF score on admission, ALJ Bullard noted, "Despite such a severe GAF assessment [on admission], Mr. Carroll was cited with many positive findings upon admission, which are not supportive of such a restrictive GAF score." (R. at 19.) Regarding Carroll's score of 45 on the day of his discharge, the ALJ noted "that this GAF score appears also to be out of line with the actual discharge report, since the claimant denied suicidal ideation and more than likely was functioning at a much higher GAF level." (R. at 19-20.)

      An ALJ may not substitute his own lay opinion for that of medical experts. While he may determine that aspects of the objective medical evidence are inconsistent or in conflict, he may not make a lay diagnosis from the medical evidence. Morales, 225 F.3d at 317, Van Horn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983). ALJ Bullard's belief that Carroll's GAF score was incorrect appears to be based solely on the fact that Carroll "had no suicidal or homicidal ideation" at the time of his discharge. (R. at 20, 170.) However, a review of other medical evidence from the same time frame illustrates that Carroll had been voluntarily hospitalized at St. Francis Medical Center two months previously for reactive depression, alcohol dependence, dysthymia, and polysubstance abuse. (R. at 149-50.) There were indications of suicidal tendencies and violent outbursts. (R. at 149, 154, 160-61.) Moreover, following Carroll's discharge from Hampton, he begin treatment at the Lester A. Drenk Behavioral Health Center. His GAF on admission to this program was similarly 45. (R. at 184.) This medical evidence supports the evidence from the Hampton Behavioral Health Center; the other evidence comes from admissions close in time to the Hampton admission and the reports show similar diagnoses and conclusions as to Carroll's problems and functioning. ALJ Bullard's failure to evaluate this evidence its temporal context and instead substitute his own analysis of Carroll's likely functioning at the time was error.

**Dr. Margaret Willman**

The Court concludes that the ALJ also erred in his analysis of the opinions of Dr. Margaret Willman, who treated Carroll at the Drenk Center after Carroll's discharge from the Hampton Behavioral Health Center. Carroll participated in treatment at this facility from April 23, 2002 to January 14, 2003; his last visit with Dr. Willman occurred on November 13, 2002. (R. at 184, 172.) The ALJ gave little weight to Dr. Willman's opinion, justifying his decision with Carroll's non-compliance with medication and attendance in the course of his treatment at the Drenk Center. (R. at 23.) ALJ Bullard noted that "[a]ny assessment concerning [claimant's] ability to work has very little merit since the claimant failed to participate with treatment." (R. at 23.)

The Court agrees that an assessment of a claimant's inability to work is entitled to little weight; whether a claimant can work is an non-medical issue reserved to the Commissioner as an administrative finding dispositive of the case. 20 C.F.R. § 404.1527(e). The ALJ properly discounted Dr. Willman's conclusion from that Carroll was "unable to hold a job." (R. at 23, 174.) However, Dr. Willman's report included other permissible opinions that should have been considered as part of the medical evidence. On Carroll's last visit, Dr. Willman noted that he was depressed, impulsive, very forgetful, had poor to fair judgment, and his adjustment in every realm was poor. (R. at 173.) She concluded he had fair concentration, persistence, and pace but poor social interaction and adaptation. (R. at 175.) ALJ Bullard noted some of these opinions, but it is not clear what weight he gave them; he expressly gave little weight to Dr. Willman's conclusions regarding Carroll's ability to work based on failure to comply with treatment, but he did not again refer to Dr. Willman's other opinions or indicate what weight they received. (R. at 23.) The ALJ must indicate which opinions he is accepting and explain the weigh he decides to

accord them.  <u>Fargnoli</u>, 247 F.3d at 42.  ALJ Bullard's failure to explain whether he was accepting any of Dr. Willman's opinion and what weight he gave it was error.

### Dr. Neil Berwish and the Family Services Program

The Court concludes that the ALJ's analyses of the conclusions of Dr. Neil Berwish and the progress notes from the Family Services program were also flawed.  While the ALJ characterized his findings as consistent with Dr. Berwish's opinion, the Court has carefully reviewed the record and concludes that ALJ Bullard improperly relied only on those findings from Dr. Berwish's opinion that tended towards a finding of non-disability.  ALJ Bullard interpreted the reports from the Family Services program as showing that Carroll "can function fairly well when he adheres to his medication, treatment, and abstains from substance abuse."  (R. at 21.)  With regard to the opinions of the psychiatrist and this program, the ALJ noted that Dr. Berwish qualified his conclusions about Carroll's symptoms with "when depressed" and did not report how often this depression occurred.  (R. at 21.)  The ALJ also focused on Dr. Berwish's conclusions that Carroll "is not significantly limited or only mildly limited in many functional areas, including being able to remember locations and work-like procedures; understanding, remembering, and carrying out very short and simple repetitive instructions or tasks; ask simple questions or request assistance from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness."  (R. at 22.)  However, an ALJ is not "entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."  <u>Robinson v. Barnhart</u>, 366 F. 3d 1078, 1083 (10th Cir. 2004).  <u>See also</u> <u>Morales</u>, 225 F.3d at 318 (holding that the judge may not simply rely on "the pieces of the examination reports that supported [his] determination," at the exclusion of other evidence).

Here, an evaluation of Dr. Berwish's report and the Family Service progress notes shows that the ALJ's conclusions about these documents are not supported by substantial evidence. The reports show that Carroll's GAF score was reported as low as 50. These documents often reflect depression, manic episodes, and poor reactions to stressors. (R. at 241, 245, 251, 260, 262). Dr. Berwish opined in a report prepared on September 9, 2005, that "[e]ven when euthymic, situational stressors easily lead to decompensation, and aggravate his deficiencies in social interaction." (R. at 266.) He further noted that Carroll does not function well when hypomanic or depressed. (R. at 266.) He reported that he could not predict how often Carroll's impairments would be so severe that they would render him unable to complete a workday but noted that "situational stressors appear to cause deterioration easily." (R. at 276.) The ALJ may certainly choose to not credit particular pieces of evidence, but he must make clear when he does so and give a reason. Morales, 225 F.3d at 317. Here, the ALJ's conclusion that Carroll "can function fairly well when he adheres to his medication, treatment, and abstains from substance abuse" did not properly take these conflicting pieces of medical evidence into account.

The ALJ noted that Dr. Berwish's conclusions that Carroll has marked limitations on his ability to accept instructions and respond appropriately to criticism, but the ALJ disregarded this opinion as without evidentiary support. (R. at 22.) The ALJ concluded that "the totality of the record illustrates that Mr. Carroll is able to work with others and his difficulty at work appears to be caused by his continued alcohol abuse, rather than the severity of his bipolar disorder, which is treatable with medication." (R. at 22.) This conclusion that alcohol dependence, rather than Carroll's other severe impairments, is the source of Carroll's problems is not supported by the record. Instead, Carroll's doctors concluded that he suffered from both impairments such as bipolar disorder and from alcohol dependence. Dr. Berwish noted that Carroll "continues to

have mood variabiity even when abstinent from [alcohol]." (R. at 269.) Dr. Berwish specifically noted that Carroll suffers from "continued mania/hypomania when abstinent." (R. at 272.) While there is evidence to support the conclusion that Carroll has a higher degree of functioning with a variety of medications, there is not evidence to support a conclusion that his impairments are "treatable with medication" in their entirety. Dr. Berwish concluded that Carroll has "reasonable stability on medication but despite compliance [is] easily derailed by stressors" leading to "mood variability." (R. at 269, 270.)

Great weight should be given to the opinions of a treating physician particularly where the relationship between that physician and the claimant lasts for a lengthy period of time. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Carroll participated in treatment with the Family Services program and from January 2003 through August 2005 and saw Dr. Berwish beginning in May of 2004. (R. at 268, 274). This is not a situation where the ALJ was faced with conflicting pieces of evidence and made a reasonable decision as to which to credit; rather, the ALJ's conclusion as to the role of Carroll's alcohol dependence on his functionality fails to account for all the opinions of Carroll's treating physicians. ALJ Bullard's conclusions as to Carroll's RFC, therefore, were not supported by substantial evidence.

This error is compounded by the fact that Carroll's attorney expressly relied on the opinions of Dr. Berwish when formulating the question he posed to Vocational Expert Schmidt at the hearing. (R. at 324-25.) Vocational Expert Schmidt was asked: "In his medical source statement [Dr. Berwish] lists that [Carroll's] markedly limited in his ability to accept instruction and to respond to criticism from supervisors. Would the individual be able to perform any of the past relevant work or any of the jobs you indicated or any other type of job?" (R. at 325.) Schmidt responded that such a limitation would preclude performing even unskilled work. (R. at

325.)  This question was based on an opinion by Dr. Berwish that was disregarded based on the ALJ's conclusion that Carroll's inability to work " appears to be caused by his continued alcohol abuse, rather than the severity of his bipolar disorder, which is treatable with medication." (R. at 22.)  As noted above, this conclusion was not supported by substantial evidence, and further consideration of the impact of Dr. Berwish's findings on Carroll's ability to work is required.

Because this case must be remanded for further proceedings, the Court does not reach Carroll's other challenges to the ALJ's decision.

## IV.     CONCLUSION

In ALJ Bullard's decision, he did not give proper weight to the medical evidence and improperly substituted his own opinions for the opinions of the medical experts.  The Court will not direct a finding of disability but will instead remand to the ALJ for proper consideration of the medical evidence.  Therefore, the decision below is vacated and the case is remanded for further proceedings.

An accompanying order will issue today.


Dated:   March 24, 2008                         /s/ Robert B. Kugler
                                                ROBERT B. KUGLER
                                                United States District Judge